FILED

2015 Jul-13  AM 08:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| ST. PAUL FIRE AND MARINE INSURANCE COMPANY, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:14-cv-00613-TMP |
| | ) | |
| TOWN OF GURLEY, ALABAMA, *et al.*, | ) ) | |
| | ) | |
| Defendants. | ) | |

## <u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>

The above styled case arises from the complaint filed by St. Paul Fire and Marine Insurance Company ("St. Paul"), seeking a declaratory judgment regarding whether the claims and damages asserted in the underlying litigation between the Town of Gurley, Alabama, and M&N Materials, Inc. ("M&N"), are covered by the insurance policy issued by the plaintiff to defendant Town of Gurley, Alabama ("the Town"). Before the court are motions for summary judgment filed by the Town, St. Paul, and M&N Materials, Inc. ("M&N"). (Docs. 32, 33, 36). The parties have not consented to the exercise of final dispositive jurisdiction by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). Accordingly, having

considered all of the arguments and evidence submitted by the parties, the court enters this Report and Recommendation.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting former Fed. R. Civ. P. 56(e)).   The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  His guide is the same standard necessary to

direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-252; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n. 11 (1983).

However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The evidence supporting a claim must be "substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d 379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact. Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-1250 (11th Cir. 2004). If the non-movant's evidence is so thoroughly discredited by the rest of the record evidence that no *reasonable* jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring a jury determination. See Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have reviewed the facts in the light depicted by the videotape."); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1290 n. 3 (11th Cir. 2009). If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted.  <u>Anderson</u>, 477 U.S. at 249 (citations omitted); <u>accord</u> <u>Spence v. Zimmerman</u>, 873 F.2d 256 (11th Cir. 1989).   Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  <u>Anderson</u>, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  <u>Brown v. City of Clewiston</u>, 848 F.2d 1534, 1540 n. 12 (11th Cir. 1988).  Utilizing these standards, the court undertakes the analysis of whether the defendant has shown that it is entitled to judgment as a matter of law.

## FACTS

Ordinarily, in deciding a motion for summary judgment, the court must take the facts in the light most favorable to the non-moving party.  In the instant case, each party has filed its own motion for summary judgment and, therefore, all parties are "movants" for purposes of summary judgment.  The facts submitted by the parties in the Motions for Summary Judgment are almost identical.  Accordingly, the facts for purposes of summary judgment have been compiled from the three separate motions for summary judgment.  Any relevant disputed fact will be noted.

## A. Background

M&N was formed by Charles Nelson and Brian McCord in 2003 as an Alabama corporation for the purpose of developing and operating a rock quarry. The principal place of business for M&N is in Alabama.  Shortly after formation, M&N purchased a 160-acre parcel of land from Nelson, on which M&N planned to develop the quarry.  The land was located in Madison County close to the Town of Gurley but outside the Town limits.  In 2003, citizens of Gurley began efforts to oppose the quarry's construction.  Eventually, a citizens action group was formed to formally oppose the quarry.  Roughly 35 members of the group attended the Gurley Town Council meeting on July 15, 2003, and requested that letters be sent to state Senator Lowell Barron and Representative Albert Hall regarding the potential annexation of M&N's property by the Town.  The Town's mayor informed the group that, based on advice from the Town's attorney, no action regarding annexation would be taken until the proposal was reviewed by the town's attorney.

On July 17, 2003, at a special meeting held to consider the issue of the quarry, the Town Council passed Resolution No. 216, which states:

> WHEREAS, The Town Council of the Town of Gurley has obtained information from the Alabama Department of Environmental Management that a corporation by the name of M & N, Incorporated,

has applied for a permit to operate a rock quarry near the corporate limits of the Town of Gurley, and

WHEREAS, the Town Council has serious concerns regarding the effects such a rock quarry would have on (1) air quality, (2) damage from blasting to homes and business, (3) large volumes of traffic on Gurley Pike (the main service road for Madison County Elementary School), (4) damage to existing streets by heavy trucks and (5) damage to the Town's water storage tank, located on Gurley Pike.

NOW, THEREFORE, be it resolved that the Town of Gurley opposes the location of a rock quarry near the corporate limits of the Town.

READ AND ADOPTED THIS 17 DAY OF JULY, 2003.

(Doc. 35-4, p. 2).  On August 5, 2003, a member of the citizens action group proposed Resolution 217 to the Town Council, but the resolution did not pass. Resolution 217 proposed that Gurley request state Senator Barron and Representative Hall sponsor legislation to permit annexation of M&N's property into the corporate limits of Gurley.

Following the proposal of Resolution 217, M&N's attorney sent a letter to Gurley, asking for "fair and impartial consideration" of all factors surrounding any possible annexation in order to "avoid the need to take any action" to protect M&N from damages resulting from annexation of the property.  (Doc. 35-6, p. 3).  On August 19, 2003, the Town Council voted again on Resolution 217, but the resolution failed to pass.  At the August 19 meeting, Gurley's attorney, Jeff

McKinney advised against annexation of the property and advised that Gurley could not enact regulations regarding blasting.  On September 2, 2003, the same citizens action group member that proposed Resolution 217 advised the Town Council that the group had sought state legislation permitting a special election regarding Gurley's ability to annex M&N's property.  The Alabama Department of Environmental Management ("ADEM") conducted a public hearing concerning the permits for which M&N had applied.  At the hearing, various public officials and Gurley residents voiced concerns regarding the potential impact of a rock quarry, including concerns about health problems, noise, property damage, and damage to roads and infrastructure.

On February 26, 2004, the Alabama Legislature passed House Bill 170, which authorized Gurley to annex M&N's property subject to a majority vote of the residents of Gurley.  On March 23, 2004, ADEM issued permits to M&N to construct and operate the quarry.  On April 13, 2004, the Town annexed M&N's property.  M&N alleges that the purpose of the annexation was "to stop the quarry by any means necessary."  (Doc. 35-1, ¶ 12).  On April 21, 2004, M&N applied to the Town for a business license, but the license was denied.  M&N alleges that all of the grounds stated for the denial of the business license were pretextual, and the true reason was to "buy time" to enact a moratorium on the issuance of business licenses.  The Town enacted Ordinance Number 281 on May 4, 2004, imposing a

moratorium on the acceptance of permit applications "pertaining to property annexed into the Town of Gurley pursuant to Alabama Act No. 2004-19 and subsequent special municipal election held in the Town of Gurley, Alabama on April 13, 2004." (Doc. 35-17). The moratorium affected only M&N's property.

The Town created the Board of Adjustment on July 6, 2004, the purpose of which was to hear applications for variances from zoning decisions. According to M&N, six of the eight board members opposed the quarry and had "Stop the Quarry" signs on their lawns. (Doc. 35-1, ¶ 19). The newly elected mayor and members of the city council also were public opponents of the quarry. According to M&N, this served to "stack the deck" against the quarry and against M&N.

During this turmoil, M&N entered into an agreement with Vulcan Lands, Inc. ("Vulcan Lands"), giving Vulcan Lands an option to purchase the property for $3.75 million. The option was set to expire on November 15, 2004. In the underlying litigation, M&N asserts that "[a]fter the election of the new mayor and council, the stacked Planning Commission, and the newly-created and stacked Board of Adjustment, Vulcan substantially reduced its purchase price 'because of this Gurley situation.'" (Doc. 35-1, ¶ 27). Ultimately, M&N sold the property to Vulcan Lands for far less than the originally agreed-upon $3.75 million. Part of the purchase price was the agreement to pay a royalty to M&N, which it alleges it

has never received because the Town has refused to allow Vulcan to operate a quarry on the site.

On December 16, 2004, M&N faxed a Notice of Claim to the Town, in which M&N alleged that the Town had annexed M&N's property without consent, "arbitrarily and capriciously" refused to issue licenses allowing M&N to conduct quarry operations, and threatened to enact zoning regulations that would prevent M&N from ever using the property as a rock quarry. The following January 2005, the Town passed Ordinance 284, which states that "[a]ll newly annexed land or property that shall be brought into the corporate limits of the Town of Gurley, Alabama, shall by operation of this section be initially zoned as Agricultural District and shall so remain zoned as Agricultural District until such time as said land or property is rezoned by the Town Council of the Town of Gurley in accordance with law." (Doc. 35-29). The zoning of M&N's property for agricultural use prevented M&N (or the purchaser, Vulcan Lands) from operating a rock quarry on the land. M&N asserts that the rezoning of the land resulted in a loss of royalty payments from Vulcan, because Vulcan has been unable to use the property as a quarry. The Town has not compensated or offered to compensate M&N for the decrease in value the property or loss of royalty revenue suffered due to the zoning.

### B. Underlying Litigation

M&N first sued the Town in 2005 in the Circuit Court of Madison County, Alabama, alleging inverse condemnation of the property by the Town.   The Complaint alleged that, "[t]he actions of Gurley have caused the property . . . to be unsuitable for its use as a limestone quarry which is its highest and best use," and that M&N "has lost the value of its property and been caused to sell such property at a loss."  (Doc. 35-19, ¶ 13).  M&N further charged that the Town's annexation and zoning of the property "constitute[d] a taking without just compensation in violation of the Fifth Amendment to the United States Constitution, Article I, Section 6, of the Constitution of Alabama (1901), and *Alabama Code* 1975, § 18-1A-1, *et seq*."  (Id. at ¶ 14).  Later, M&N amended its complaint to allege the following additional claims for relief: wrongful interference with contractual or business relations; negligence and wantonness; negligent and/or wanton hiring, retention and supervision; a motion for declaratory judgment; and a motion for injunctive relief.   (Id. at pp. 6-13).   M&N voluntarily dismissed its Fifth Amendment claim after the Town removed the case to this court based upon federal-question jurisdiction, and the case was remanded to state court.  Town of Gurley v. M&N Materials, Inc., 143 So. 3d 1, n. 2 (Ala. 2012).  M&N's suit on the remaining state-law claims was tried before a jury, which found against the Town only on the claim of inverse condemnation, and awarded M&N $2.75 million in

damages.  The Town appealed the decision, and the Supreme Court of Alabama reversed the trial court's judgment for M&N on the inverse condemnation claim on the basis that Alabama law does not recognize a claim for inverse condemnation arising from a regulatory restriction.  Town of Gurley, 143 So.2d at 18.  In his concurrence, Justice Parker noted that the Alabama Supreme Court's decision does not bar M&N from seeking relief under the Fifth Amendment, despite the fact that M&N previously voluntarily dismissed the claim.  Id. at 41.

The present underlying action was filed in this court on January 31, 2014. M&N Materials, Inc. v. Town of Gurley, Alabama, et al., Case No. 5:14-cv-00184-CLS.  In the underlying action, M&N raises the following claims for relief: (1) unconstitutional taking in violation of the Fifth Amendment as incorporated by the Fourteenth Amendment; (2) arbitrary and capricious due process denial under the Fifth and Fourteenth Amendments; (3) declaratory judgment invalidating the annexation and/or zoning of the property; (4) declaratory judgment under Alabama Code 1975 § 6-6-220, et seq. declaring the annexation and/or zoning restrictions on the property void, invalid, and/or unconstitutional; and (5) injunction preventing the Town from exercising control over the property.  M&N Materials, Inc., Case No. 5:14-cv-00184-CLS, (Doc. 1).  The underlying action is pending in this court before Judge C. Lynwood Smith, and dispositive motions have not yet been filed in the action.

### C. St. Paul Insurance Policies[1]

St. Paul issued a Public Entity Composite Policy ("the Policy") to Gurley in 2003 and 2004 to cover the periods of October 14, 2003 to October 14, 2004 and October 14, 2004 to October 14, 2005.  The Policies contained identical Public Entity Management Liability Protection ("PEML") and Public Entity General Liability Protection ("PEGL") parts.[2]  The PEML part states, in relevant part, the following:

**What This Agreement Covers**

**Public entity management liability.**   We'll pay amounts any protected person is legally required to pay as damages for covered loss that:
- results from the conduct of duties by or for a public entity;
- is caused by a wrongful act committed on or after the retroactive date[3] and before the ending date of this agreement; and
- results in a claim first made or brought while this agreement is in effect, or during the limited reporting period or the extended reporting period, if either one applies.

. . .

---

[1]   St. Paul is defending Gurley with respect to M&N's claims in the underlying action, subject to a full reservation of all rights.  (Doc. 35-27).

[2]   The relevant portions of the 2003 and 2004 policies are identical, therefore, all language will be taken from the 2004 policy, and all references to the policies will cite to the 2004 policy.

[3]   The Policy recites the retroactive date to be October 7, 1989.

**When This Agreement Covers**

**During this agreement or the limited reporting period, if it applies.** We'll apply this agreement to claims for covered loss only when they're first made or brought:

- while this agreement is in effect; or
- during the limited reporting period, if it applies.

*Limited reporting period* means the 60 days, starting with the ending date of this agreement, during which claims for covered loss may be first made or brought.

**When we consider a claim to be first made or brought.** We'll consider a claim for covered loss to be first made or brought on the earliest of the following dates:

- The date that we or any protected person first receives written notice of such claim.
- The date that we first receive written notice from any protected person of a specific wrongful act that caused the loss which resulted in such claim.

. . .


**When the limited reporting period will apply.**
The limited reporting period will automatically apply without an additional premium if this agreement is canceled or not renewed for any reason. It may not be canceled by you or us once it applies.

. . .


**Exclusions – What This Agreement Won't Cover**

. . .

**Declaratory, injunctive, or other non-monetary relief.** We won't cover:

14

- any cost, expense, or fee; or
- any amount required to comply with a court or administrative agency order, judgment, ruling or decree, or a federal, state, or local law;

that results from any action or demand, or any part of any claim, which seeks declaratory, injunctive, or other non-monetary relief.

Such costs, expenses, fees, or amounts include the following:
- The costs of physical alterations or other changes made to accommodate or afford accessibility to any disabled person.
- The cost of developing, implementing, or enforcing any company policy, procedure, or program.

*Declaratory, injunctive, or other non-monetary relief* includes:
- a judgment which declares the rights and duties of any person or organization; or
- any type of injunction, restraining order, or any other non-monetary relief.

. . .

**Known wrongful acts.**  We won't cover loss that results from any wrongful act, including any part of related wrongful acts, which any protected person:
- knew about before the beginning date of this agreement; and
- could reasonably foresee would result in a claim being made or brought while this agreement is in effect.

. . .

**Public use of property.**  We won't cover loss that results from;
- any method or proceeding used in the taking or controlling of private property for public use; or
- the diminution in value or inverse condemnation of property that's caused by the taking or controlling of private property for public use.

> *Method or proceeding* includes condemnation, adverse possession, and dedication by adverse use.

(Doc. 35-25, pp. 76-85).  The PEGL part of the Policy issued to the Town states, in

relevant part:

> ### What This Agreement Covers
>
> **Bodily injury and property damage liability.**  We'll pay amounts any protected person is legally required to pay as damages for covered bodily injury or property damage that:
> - happens while this agreement is in effect; and
> - is caused by an event.
>
>  . . .
>
> *Property damage* means:
> - physical damage to tangible property of others, including all resulting loss of use of that property; or
> - loss of use of tangible property of others that isn't physically damaged. . .
>
> . . .
>
> *Event* means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
>
> . . .

## Exclusions – What This Agreement Won't Cover

**Expected or intended bodily injury or property damage.**   We won't cover bodily injury or property damage that's expected or intended by the protected person.

Nor will we cover such medical expenses that result from such bodily injury.

But we won't apply this exclusion to bodily injury, property damage, or medical expenses that result from the use of reasonable force to protect persons or property.

. . .

**Public use of property.**   We won't cover injury or damage that results from:

- any method or proceeding used in the taking or controlling of private property for public use; or
- the diminution in value or inverse condemnation, or property that's caused by the taking or controlling of private property for public use.

*Method or proceeding* includes condemnation, adverse possession, and dedication by adverse use.

(Doc. 35-24, pp. 116, 117; Doc. 35-25, pp. 4, 11, 20).  St. Paul initiated this action

seeking a declaration from this court that it owes no coverage to the Town under

the PEML or PEGL parts of the Policies issued to the Town in 2003 and 2004.

## DISCUSSION

The determination of this case hinges almost entirely on the interpretation of the various provisions and exclusions in the PEGL and PEML parts of the Policy. St. Paul argues that none of the claims in the underlying action fall within the Policy's coverage, either because of Policy exclusions or because the underlying claims do not meet coverage requirements.  Therefore, St. Paul argues that it has no duty to defend the Town in the underlying action or to indemnify the Town for any judgment against it.  The issue that must be determined, therefore, is whether any or all of the claims in the underlying action fall within the coverage provided by the Policy and, if so, whether the claims are then excluded from coverage by Policy exclusions.  Applying Alabama law, the Town has the burden of proving that the claims come within the coverage provided, while St. Paul as the burden of proof as to whether any exclusion applies.

Alabama law places the burden on the insured to show that a claim falls within the coverage provided by an insurance policy.  Universal Underwriters Ins. Co. v. Stokes Chevrolet, Inc., 990 F.2d 598, 602 (11th Cir. 1993) citing Jordan v. National Accident Ins. Underwriters, Inc., 922 F.2d 732, 735 (11th Cir. 1991); Colonial Life and Accident Ins. Co. v. Collins, 194 So. 2d 532, 535 (Ala. 1967). The burden then shifts to the insurer to prove the applicability of a policy exclusion.  Id. at 604, citing Jordan, 922 F.2d at 735; Flemming v. Alabama Farm

18

Bureau Mut. Cas. Ins. Co., 310 So.2d 200, 202 (Ala. 1975).   Accordingly, the Town must prove that the claims in the underlying action fall within Policy coverage.   Then, it is up to St. Paul to show that claims falling within Policy coverage are excluded from coverage due to express exclusions set out in the Policy.

## I.    Policy Coverage

St. Paul asserts in its motion for summary judgment (doc. 33) that all of M&N's claims in the underlying action stem from the Town's annexation and re-zoning of M&N's property – which M&N claims was a violation of the Fifth Amendment takings clause and the Fourteenth Amendment due process clause. St. Paul argues that the Town's claims do not fall within the policy coverage because, in the underlying action, M&N does not allege covered property damage that was caused by an "event," as required for coverage under the policy.   "An insurance company's duty to defend its insured is determined by the language of the insurance policy and by the allegations in the complaint giving rise to the action against the insured.   If the allegations accuse the insured of actions for which the insurance company has provided protection, the insurance company is obligated to defend the insured."   Ajdarodini v. State Auto Mutual Insurance Co., 628 So. 2d 312, 313 (Ala. 1993) (internal citations omitted).

"[A] court ordinarily will have no reason to immerse itself in the facts surrounding the incident in question; it need only look to the allegations made against the insured and decide whether, if proven, those allegations would establish an injury that the policy would cover. St. Paul Fire and Marine Ins. Co. v. Town of Gurley, Ala., 2012 WL 3637690, *4 (N.D. Ala. August 22, 2012), quoting Nationwide Ins. v. Zavalis, 52 F.3d 689, 694 (7th Cir. 1995). Therefore, it is the duty of the undersigned to determine whether the *allegations* in the underlying complaint are subject to coverage by the St. Paul policy. The merits of the case will be left for evaluation and decision in the underlying action. "As long as the complaint comprehends an injury which may be within the scope of the policy, the company must defend the insured until the insurer can confine the claim to a recovery that the policy does not cover." St. Paul Fire and Marine Ins. Co. v. Town of Gurley, Ala., 2012 WL 3637690, *4 (N.D. Ala. August 22, 2012), quoting Nationwide Ins. v. Zavalis, 52 F.3d 689, 694 (7th Cir. 1995).[4] So, if the Policy requires defense of any of the claims in the underlying action, St. Paul must

---

[4]   "When a complaint alleges both acts covered under the policy and acts not covered, the insurer is under a duty to at least defend the allegations covered by the policy." Acceptance Ins. Co. v. Brown, 832 So. 2d 1, 14 (Ala. 2001) citing Blackburn v. Fidelity & Deposit Co. of Maryland, 667 So. 2d 661, 670 (Ala. 1995), Tapscott v. Allstate Ins. Co., 526 So. 2d 570, 574 (Ala. 1988). This statement references the *dicta* in Tapscott. Because this court has adopted the standard set forth by the 7th Circuit, requiring full representation if any claim in the complaint is subject to the duty to defend, this court will apply that standard.

defend the Town against all claims in the underlying action.  The same does not hold true for indemnification, which will be discussed further below.

### A.  *Time Period Covered by the Policy*

St. Paul asserts in its motion that no coverage exists under the PEML portion of the 2003 Policy because the claims by M&N in the underlying action were not "first made or brought" while the 2003 PEML part was in effect.  (Doc. 34, p. 25). Indeed, the Town was served with M&N's Complaint in the prior state court action on April 18, 2005, after coverage by the 2003 Policy had lapsed.  As the Town points out in its own motion for summary judgment, the Town first presented the claim to St. Paul in April 2005.  (Doc. 32-1, p. 21).  The 2004 Policy covered the Town from October 2004 to October 2005, and M&Ns action was initiated within that time period.[5]

St. Paul does not argue that the Town's claim was not made during the applicable time period for the 2004 renewal policy (doc. 34, p. 25), and neither the Town nor M&N argue that coverage exists *only* under the 2003 policy *specifically*, just that coverage exists under the Policies issued by St. Paul over the relevant time period.  (Doc. 32-1, p.21; Doc. 37, p. 16).  It appears that there is no real conflict in regard to whether the claim at issue was brought within a time period covered by

---

[5]    Although it makes no difference in the outcome of the case, M&N actually presented its claim to the Town for the first time in a written Notice of Claim filed with the Town clerk on December 16, 2004.  This date also was within the effective dates of the 2004 renewal Policy.

the 2004 policy.[6]     Therefore, the Town has sufficiently met its burden to show that its claim falls within coverage of this aspect of the PEML policy.

### B. PEML Coverage

The PEML portion of the Policy covers damages for "covered loss" that "results from the conduct of duties by or for a public entity; is caused by a wrongful act committed on or after the retroactive date and before the ending date of this agreement; and results in a claim first made or brought while this agreement is in effect, or during the limited reporting period or the extended reporting period, if either one applies."  (Doc. 35-25, p.76).  That the claim falls within the "Public entity management liability" portion does not appear to be a point of contention between the parties.  The Town focuses primarily on the relevant time period in its motion for summary judgment (doc. 32-1, p. 20), and, as M&N points out in its motion for summary judgment, St. Paul does not dispute that the underlying action arose from "actions undertaken by Gurley in its capacity as a municipality." (Doc. 37, p. 15).  Accordingly, the Town has met its burden of showing that the underlying action falls within the coverage of the PEML portion of the Policy.

---

[6]  Frankly, the court fails to grasp the point of St. Paul's argument on this issue.  Although it is true that the claim was not first made during the term of the 2003 policy, there appears to be no dispute that it clearly was made during the term of the 2004 policy.  St. Paul admits as much at page 24 of its principal summary judgment brief (Doc. 34).  The parties agree that both policies contain identical language, so there seems to be no reason for focusing so much attention on the 2003 policy while ignoring the apparent applicability of the identical 2004 policy.

### C. PEGL Coverage

Finally, St. Paul claims that it has no duty to the Town under the PEGL portion of the policy because the damages alleged by M&N were not "property damage" caused by an "event" as these words are defined in the policy.  The PEGL policy defines "property damage" as "physical damage to tangible property of others, including all resulting loss of use of that property; or loss of use of tangible property of others that isn't physically damaged."  (Doc. 35-24, p. 117).  St. Paul contends that the type of damage asserted by M&N in the underlying action is "purely economic" and therefore, not covered.  St. Paul claims that "[e]ven if M&N's complaint in the underlying action could be read to allege covered damage under the PEGL part, the terms of the PEGL's insuring agreement are only satisfied if the damage is caused by an 'event.'"  (Doc. 35-25, p. 4).  Under the PEGL part of the policy, an "event" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 35-24, p. 117).

The court agrees with St. Paul that the damage claimed by M&N against the Town was not the product of an "accident" and therefore no "event" caused the damage within the meaning of the PEGL coverage.  As explained above, coverage exists under the PEGL portion of the policy only if the personal injury or property damage was caused by an "event."  That term is further defined by the policy to

23

mean an "accident."  By its nature, an "accident" is unintended, the product of thoughtlessness or carelessness.  See Hartford Casualty Ins. Co. v. Merchants & Farmers Bank, 928 So. 2d 1006, 1011 (Ala. 2005) ("Accident" is defined as "An unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could be reasonably anticipated") (quoting Black's Law Dictionary 15 (7th ed.).[7]  In no way can the annexation, license moratorium, and zoning of the M&N property be considered an accident.  The Town very clearly and explicitly *intended* to prevent the operation of the quarry by annexing the land into the town limits and then zoning it in such a way as to prevent its use as a quarry.  There can be no reasonable argument that the Town did not know that doing so would have a detrimental effect on the property value and M&N's economic interest in it.  Whatever damage M&N suffered due to the loss of the opportunity to use the land for a quarry,[8] it was not caused by an "accident," and thus was not the product of an "event," as required for coverage

---

[7]  The court does not accept the Town's argument that because the Alabama Supreme Court took the definition of "accident" from the 7th edition of Black's Law Dictionary, this court should disregard the explicit definition given by that court and refer to the newer 8th edition.  The reference to Black's in Alabama cases cannot be read as a license for this court to "update" the state supreme court's definition of a term every time a new edition of the venerable tome is released.  Such updating would be for the state supreme court to do.

[8]  The Town asserts that it did not know the *extent* of the damage M&N would suffer due to its actions, but this is immaterial to the coverage question.  Whether the Town knew it would do a lot or a little damage to M&N, it does not dispute that it knew *some* damage would occur.  In any event, the question whether the damage was caused by an "accident" turns not on knowledge of the extent of damage, but the intent to carry out the acts that resulted in any damage.  An intended act is not an accident.

under the PEGL portion of the policy.  It appears, therefore, there is no PEGL coverage for the claims made by M&N against the Town.

Nevertheless, because the PEML portion of the policy does not limit coverage to damage to tangible property arising out of an "event," even if St. Paul has no duty to defend under the PEGL portion of the policy, it cannot claim that there is no duty to defend under the policy as a whole.  Accordingly, the Town has met its burden of showing that the claims in the underlying action fall within PEML Policy coverage.  The burden now shifts to St. Paul to show that one or more policy exclusions apply to the various claims.

## II.    Exclusions

### A. *Public Use of Property Exclusion*

Both the PEML and PEGL sections of the Policy contain coverage exclusions for the public use of property.  The exclusions are identical and state as follows:

> **Public use of property.**  We won't cover loss that results from;
> - any method or proceeding used in the taking or controlling of private property for public use; or
> - the diminution in value or inverse condemnation of property that's caused by the taking or controlling of private property for public use.

> *Method or proceeding* includes condemnation, adverse possession,
> and dedication by adverse use.

(Doc. 35-25, pp. 85, 20).  St. Paul argues that Counts I and II of the Complaint in

the underlying action are subject to the "public use of property" exclusion and,

therefore, it has no duty to defend the Town against Counts I and II of the

underlying action.

### 1. Count I – Unconstitutional Taking

In Count I of the underlying action, M&N claims that the Town's actions

"amount to an unconstitutional taking of M&N's property without just

compensation," as prohibited by the Fifth Amendment to the United States

Constitution and incorporated against the states by the Fourteenth Amendment.

(Case No. 5:14-cv-00184-CLS, Doc. 1, ¶¶ 34-35).  With regard to the taking of

private property, the Fifth Amendment states that "private property [shall not] be

taken for public use, without just compensation."  U.S. Const. amend. V, full text.

Count I of the complaint in the underlying action specifically references the Fifth

Amendment and clearly is based on an alleged violation thereof.  (Case No. 5:14-

cv-00184-CLS, ¶ 35).

St. Paul is correct in its assertion that, if proven, damages claimed pursuant

to a violation by the insured of the Fifth Amendment would be excluded from

coverage under both the PEML and PEGL portions of the Policy.  The very

purpose of this exclusion is to prevent the insurance company from being called on to fund an exercise of eminent domain by the Town.  Absent the exclusion, an insured municipality could take private property for a public use and then call on the liability insurance carrier to pay for the value of the property claimed by the property owner.  The exclusion removes from liability coverage any taking of private property for public use.

In its motion for summary judgment, the Town argues, however, that the underlying action is not subject to the "public use of property" exclusion because the policy should be interpreted to ascribe a narrower meaning to the phrase "public use" than St. Paul would have the court apply.  Specifically, St. Paul argues that the court should read the phrases "public use" and "public purpose" interchangeably (doc. 32-1, p. 25), while the Town urges the court to narrowly interpret the word "use" in the policy.  The Town contends that the plain language of the policy is not ambiguous and that "[i]n order for this exclusion to be applicable, the Town must have taken or controlled M&N's private property for a public use through an act of condemnation, adverse possession, or dedication by adverse use."  (Id. at 26). The Town asserts that, although the word "use" is not defined in the policy, the word is not ambiguous because, "[w]here terms are not defined, the meaning of a word to a person of average intelligence is to be applied."  (Doc. 32-1, p. 26).  The Town claims that a person of average

intelligence would presume that the word "use" entails actively employing the land for some purpose, rather than merely passively preventing a particular use of it.

The Town has cited no controlling case law supporting such a narrow interpretation of the phrase "public use." The Town argues that, in the case where a word is not defined, but no ambiguity exists, Alabama contract law "does not require reading a word in a contract as a legal term of art, or applying a legal interpretation under a certain context. It is the plain language of the words that are to be applied where no ambiguity exists." (Doc. 32-1, p. 26). However, when the United Sates Supreme Court has interpreted the meaning of a phrase in a certain context, that meaning is not to be ignored, particularly where that interpretation is in a body of law meant to be dealt with by the contract exclusion.

In Kelo v. City of New London, Connecticut, the United States Supreme Court addressed the issue of "whether a city's decision to take property for the purpose of economic development satisfies the 'public use' requirement of the Fifth Amendment." 545 U.S. 469, 477, 125 S. Ct. 2655, 2661 (2005). The Supreme Court advanced a broad interpretation of the "public use" test for purposes of Fifth Amendment taking arguments:

> [T]his "Court long ago rejected any literal requirement that condemned property be put into use for the general public." Id., at 244, 104 S. Ct. 2321. Indeed, while many state courts in the mid-19th

century endorsed "use by the public" as the proper definition of public use, that narrow view steadily eroded over time.  Not only was the "use by the public" test difficult to administer (*e.g.*, what proportion of the public need have access to the property? At what price?), but it proved to be impractical given the diverse and always evolving needs of society.  Accordingly, when this Court began applying the Fifth Amendment to the States at the close of the 19th century, it embraced the broader and more natural interpretation of public use as a "public purpose."  See, *e.g.*, Fallbrook Irrigation Dist. v. Bradley, 164 U.S. 112, 158-164, 17 S. Ct. 56, 41 L. Ed. 369 (1896).  Thus, in a case upholding a mining company's use of an aerial bucket line to transport ore over property it did not own, Justice Holmes' opinion for the Court stressed "the inadequacy of use by the general public as a universal test."  Strickley v. Highland Boy Gold Mining Co., 200 U.S. 527, 531, 26 S. Ct. 301, 50 L. Ed. 581 (1906).  We have repeatedly and consistently rejected that narrow test ever since.

The disposition of this case therefore turns on the question whether the City's development plan serves a "public purpose."  Without exception, our cases have defined that concept broadly, reflecting our longstanding policy of deference to legislative judgments in this filed.

Kelo v. City of New London, Conn., 545 U.S. 469, 479-480, 125 S. Ct. 2655, 2662-2663 (2005).  There is no reason to define the phrase "public use" differently than the Supreme Court of the United States when no alternate definition is provided in the policy.  One can reasonably presume that, in drafting the language of the exclusion, St. Paul was aware of the way in which the term "public use" is construed in Fifth Amendment takings cases.  "Public use" was intended to convey "public purpose," just as the cases have interpreted the phrase for a hundred years.

Furthermore, the Supreme Court of Alabama has addressed a similar distinction when evaluating an alleged taking.  In <u>Aldridge v. Tuscumbia, C. & D.R. Co.</u>, the Alabama Supreme Court opined, "[t]he distinction taken, between public use and public benefit, does not seem to me, sustained by reason; nor has precedent attached a different meaning to the terms: in practical application, they are convertible terms. . . . Whatever is beneficially employed for the community, is of public use, and a distinction cannot be tolerated."  1832 WL 566, *1 (June 1, 1832).  Though old and graying, <u>Aldridge</u> has not been overruled or otherwise abrogated.  Although <u>Aldridge</u> addresses the word "benefit," rather than the word "purpose," the two words seem to have the same connotation in a Fifth Amendment context.

In the instant case, as in <u>Aldridge</u> and <u>Kelo</u>, any distinction between the phrases "public use" and "public purpose" (or "public benefit") merely is an exercise in intellectual gymnastics.  The "public use" or "public purpose" contemplated by the Town when annexing the property was the prevention of pollution, avoidance of damage to homes and businesses, reducing large volumes of traffic on the main access road to the Madison County Elementary School, and preventing damage to the streets caused by heavy trucks.  These "public purposes" were explicitly set out in the Town Council's Resolution 216.

Furthermore, it already has been determined in the underlying action that "M&N's claim is for a 'regulatory taking,'" in violation of the Fifth Amendment. (Case No. 5:14-cv-00184-CLS, Doc. 23, p. 12).  Regarding Count I, *as alleged*, St. Paul has met its burden of proving that the claim is excluded from policy coverage by the "public use of property" exclusion.  Whether or not Gurley's annexation and subsequent rezoning of the property *actually was* a taking as contemplated by the Fifth Amendment is not for this court to decide.  That issue is pending in Case No. 5:14-cv-00184-CLS.  Because the allegations in Count I fall within the "public use of property" exclusion, St. Paul appears to have no duty to defend the Town against Count I of M&N's complaint in the underlying action.

Despite the fact that Count I of the Complaint in the underlying action falls within a policy exclusion, St. Paul still may have a duty to defend the Town in the underlying action.  If St. Paul has a duty to defend the Town of Gurley against *any* of the claims in the underlying action, it must defend Gurley against *all* of the claims brought against it.  "As long as the complaint comprehends an injury which may be within the scope of the policy, the company must defend the insured until the insurer can confine the claim to a recovery that the policy does not cover."  St. Paul Fire and Marine Ins. Co. v. Town of Gurley, Ala., 2012 WL 3637690, *4 (N.D. Ala. August 22, 2012), quoting Nationwide Ins. v. Zavalis, 52 F.3d 689, 694

(7th Cir. 1995).   Therefore, Counts II through V of M&N's complaint in the underlying action still must be examined.

### 2.   Count II – Arbitrary and Capricious Due Process Denial

In Count II of the complaint in the underlying action, M&N claims that the Town, by annexing and zoning the property at issue for agricultural use, deprived M&N of its property interest and did so "in an arbitrary and capricious manner." (Case No. 5:14-cv-00184-CLS, Doc. 1, ¶ 42).   M&N argues that this deprivation was a violation of M&N's "right of due process of law under the Fifth and Fourteenth Amendments to the United States Constitution which protects M&N from arbitrary and capricious government conduct that would deprive M&N of its legitimate property interests."   (Id. at ¶ 40).   In its motion for summary judgment, St. Paul counters that Count II also arises from M&N's Fifth Amendment takings claims and, therefore, is excluded from coverage by the "public use of property" exclusion.

In its motion for summary judgment, M&N argues that the "public use of property" exclusion does not apply to the arbitrary and capricious due process claim because the due process claim creates a cause of action separate and apart from the alleged regulatory taking, and that cause of action can arise independently of the first claim.   In support of that argument, M&N cites City of College Station v. Star Ins. Co., 735 F.3d 332 (5th Cir. 2013).   In College Station, the insured city

sued its insurer for indemnification of defense costs.  In the underlying action in College Station, a land developer claimed that the city rezoned the land on which it planned to develop a shopping center, treating the developer differently than other developers who had developed properties nearby, because the city was biased against Walmart (which the developer intended to be the anchor store for the shopping center) and other "big box" retailers.  735 F.3d at 335.  The insurance company claimed, like St. Paul does here, that all of the developer's claims in the underlying action arose out of the developer's Fifth Amendment takings claim and, therefore, were excluded by the policy's "inverse condemnation" exclusion.  Id. at 336.  The district court agreed but, on appeal, the Fifth Circuit reversed the district court's reasoning.

The circuit court determined that the underlying complaint "alleged facts sufficient to create a possibility of liability wholly independent of WRI's inverse condemnation act – liability that could 'arise' whether or not the City's zoning decisions amount to a taking that warrants just compensation."  Id. at 338.  The court elaborated:

> We begin by examining WRI's allegation that the City's zoning decisions were discriminatory and driven by an irrational animus toward WRI and WALMART, depriving WRI of its right to equal protection.  To understand why these allegations create the potential of liability "arising" independently of WRI's inverse condemnation

action, an extreme illustration is helpful.  Suppose that a municipality has a policy or custom of imposing zoning restrictions on properties purchased by racial minorities – restrictions that do not physically intrude on the properties and reduce their value by only about 1%.  No one would argue that such restrictions amount to regulatory takings; however, the municipality would still be liable for violating the Equal Protection Clause.  To say that the municipality's liability in such circumstances "arises out of" an "inverse condemnation" action is untenable – the liability arises out of the city's constitutional malfeasances.  And the same general logic applies here.  Though the allegations of discrimination in WRI's complaint are less compelling than the facts of our hypothetical, the duty to defend is triggered even by frivolous or groundless allegations.

We next consider WRI's related allegation that the City's zoning decisions were arbitrary – driven by an irrational bias against WRI and Walmart – and therefore violated WRI's right to substantive due process.  Again, we are satisfied that these allegations create the possibility of liability "arising" independently of WRI's inverse condemnation action.

Id. at 338-339.

In the underlying action here, M&N bases its arbitrary and capricious due process claim on the allegation that "[t]he town specifically targeted M&N in order to prevent it from operating a lawful and properly licensed business.  The Town's hostility to M&N's property interests while knowing of M&N's substantial investment of time, money and effort exhibited a flagrant disregard of M&N's constitutionally protected rights," and that "[t]he Town had no legitimate public interest that was furthered by its actions."  (Case No. 5:14-cv-00184-CLS, Doc. 1, ¶¶ 42-43.)

In the statement of facts included in the complaint in the underlying action, M&N claims that the entire purpose of the annexation was to stop M&N from developing and operating a rock quarry.  (Case No. 5:14-cv-00184-CLS, Doc. 1, ¶ 12.)  In fact, M&N claims that the Town wanted to stop the quarry "by any means necessary."  Id.  Although the Complaint does not claim that the Town was biased against the company specifically, it does allege a bias against the type of business that M&N intended to operate, much like the town in College Station's alleged bias against "big box" retailers.  The alleged bias is not as compelling or as readily identifiable as the one put forth in the Fifth Circuit's hypothetical, but the alleged bias does create a claim arising separate and apart from M&N's Fifth Amendment taking claim.

Because M&N could bring the due process claim without the Fifth Amendment taking claim, and recovery for a due process violation does not require that a Fifth Amendment taking actually be found, St. Paul has not met its burden of showing that Count II of the underlying complaint falls within the "public use of property" exclusion of the Policy.  Accordingly, this policy exclusion provides no basis for St. Paul to refuse to defend the Town against the claim and, thus, against the suit.  Because a verdict has not yet been reached in the underlying case, the issue of indemnification is not yet ripe for adjudication, as discussed further below.

### B. Known Wrongful Acts Exclusion

The PEML section of the Policy contains a coverage exclusion for "known wrongful acts," which reads:

> **Known wrongful acts.**  We won't cover loss that results from any wrongful act, including any part of related wrongful acts, which any protected person:
> - knew about before the beginning date of this agreement; and
> - could reasonably foresee would result in a claim being made or brought while this agreement is in effect.

(Doc. 35-25, p. 84).[9]  By its terms, this exclusion is intended to remove from coverage any "loss" that any insured "protected person" knew about "before the beginning date" of the insurance coverage and "could reasonably foresee" would result in a claim being made after the insurance went into effect.  Its purpose is to avoid coverage for wrongful acts occurring prior to the effective date of the insurance and known to the insured but upon which claims are made after the insurance goes into effect.

---

[9]   In its motion for summary judgment, St. Paul does not reference or argue that the "expected or intended bodily injury or property damage" exclusion of the PEGL portion of the policy is applicable.  (Doc. 34, p. 23).  Accordingly, St. Paul has not met its burden of proving that exclusion is applicable, and the court's analysis will focus on the "known wrongful acts" exclusion of the PEML portion of the Policy.  Of course, the court has already determined that the Town cannot show that it is entitled to any coverage under the PEGL portion of the policy.

### 1. Count I – Unconstitutional Taking

The court already has determined that Count I of the underlying complaint is precluded from coverage under either the PEML or PEGL parts of the Policy due to the "public use of property" exclusion.  However, for the same reasons set out below with respect to Count II, Count I of the complaint in the underlying action is not subject to the "known wrongful acts" exclusion in the PEML coverage.

### 2. Count II – Arbitrary and Capricious Due Process Denial

The PEML portion of the Policy covers damages resulting from a "wrongful act committed on or after the retroactive date and before the ending date of this agreement" that "results in a claim first made or brought while this agreement is in effect." (Doc. 35-25, p. 76).  The Policy goes on to define "wrongful act" as "any act, error, or omission," but it does not specify any criteria that make an act "wrongful," other than it "results in a claim."  St. Paul argues in its motion for summary judgment that the events giving rise to the underlying complaint by M&N fall into the "known wrongful acts" exclusion because the efforts constituting "wrongful acts" to stop the quarry began "as early as May of 2003," before the effective date of the Policy.  (Doc. 34, p. 21)  St. Paul points out further that, in response to these efforts, the Town's attorney, in August 2003 (still before the effective date of the Policy), advised against annexation of M&N's property.  Because of this warning, St. Paul asserts that the Town could (and, in fact, did)

reasonably foresee that annexation would result in a claim being brought during the policy period.

On April 13, 2004 (*after* the effective date of the Policy), the Town annexed the property at issue by a majority vote. Prior to this date, no affirmative actions limiting M&N's ability to use the property had been taken by the Town because the property was outside its jurisdictional limits. All of the efforts opposing the quarry beginning in 2003 and continuing up to the annexation itself could not have been the basis for a "claim" because none of the pre-annexation actions of the Town had the ability to prevent M&N's use of the land for a quarry or to cause M&N any damage or injury. Until it annexed the land, the Town did nothing that could be understood to expose the Town to liability for a claim by M&N. If the annexation had never occurred, the loss and damages complained of by M&N could not have occurred, at least not as the result of anything the Town did. Because these pre-annexation "efforts" were neither wrongful nor the bases for a claim to be made by M&N, they are not sufficient to invoke the "known wrongful acts" exclusion.

After the annexation, on April 21, 2004, the Town denied M&N a business license, and on May 4, 2004, the Town instituted a moratorium on the acceptance of new permit applications, which moratorium was structured in a way that it impacted the M&N property exclusively. These acts reasonably could be foreseen

by the Town as resulting in a claim, but during this time, the 2003 Policy was in effect (the effective dates for the 2003 policy were October 14, 2003 to October 14, 2004).   Accordingly, the "known wrongful acts" exclusion for the 2003 policy is inapplicable to any claim made by M&N due to the annexation of its land and other acts by the Town thereafter.   In order for the exclusion to apply, the wrongful act must be known about *before* the beginning date of the policy and be something that could be reasonably foreseen as resulting in a claim.   Nothing that took place prior to the annexation itself can be said to have been reasonably foreseeable by the Town to result in a claim.

The question becomes, then, whether the acts listed above – the annexation, the denial of a business license, and the moratorium on new license applications -- which took place before the beginning date of the *2004* Policy became effective, are subject to the "known wrongful acts" exclusion contained in that Policy. Although the annexation and denial and moratorium on business licenses occurred after the effective date of the 2003 Policy, the "claim" was not made until December 16, 2004, when M&N gave its written Notice of Claim to the Town.   At that time the 2003 Policy had expired, being replace on October 14, 2004 by the identical 2004 Policy.   The language in the exclusion referring to the "beginning date of *this* agreement," therefore, might be read as using the effective date of the 2004 Policy (not the earlier 2003 Policy it replaced) as the key date for

interpretation and application of the exclusion.   (Italics added for emphasis).
Thereafter, in January 2005, the Town passed an ordinance zoning the M&N land
for agricultural purposes only.  Clearly, the passage of the zoning ordinance, to the
extent it was a "wrongful act," did not predate the 2004 Policy and, therefore, is
not subject to the exclusion.  M&N then filed suit against the Town in state court in
April 2005.

St. Paul claims that, because the Town's attorney advised against any action
regarding M&N's property, the Town was on notice, when it annexed the land,
denied the business license, and put a moratorium on license applications, that a
lawsuit from M&N was likely and such suit would result in a claim against the
Policy.  Thus, by the logic of this argument, the Town knowingly engaged in the
"wrongful acts" of annexation, denial of a business license, and a moratorium on
new license applications, all before the effective date of the 2004 Policy and, based
on the advice of Town counsel, the Town could and did reasonably foresee that the
acts would result in a claim being made during the term of the 2004 Policy.

The court is unpersuaded.   At the outset, it must be remembered that
liability-insurance exclusions, where ambiguous, must be strictly construed against
the insurer and to provide coverage for the insured.  "[W]e are mindful of some
general principles applicable when construing insurance contracts. A contract of
insurance will be construed strictly against the insurer and liberally in favor of the

insured. Ambiguous provisions of an insurance policy will be construed most strongly against the insurer and in favor of the insured. Twin City Fire Ins. Co. v. Alfa Mutual Ins. Co., 817 So. 2d 687, 695 (Ala. 2001), citing Life Ins. Co. of Georgia v. Miller, 292 Ala. 525, 296 So. 2d 900 (Ala. 1974). "Exclusions are to be interpreted as narrowly as possible, so as to provide maximum coverage for the insured, and are to be construed most strongly against the insurance company that drafted and issued the policy." Cook v. Aetna Ins. Co., 661 So. 2d 1169, 1170 (Ala. 1995), citing Alliance Ins. Co. v. Reynolds, 494 So. 2d 609 (Ala. 1986); Employers Ins. Co. of Alabama v. Jeff Gin Co., 378 So. 2d 693 (Ala. 1979). "Where the parties disagree on whether the language in an insurance contract is ambiguous, a court should construe language according to the meaning that a person of ordinary intelligence would reasonably give it." Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co., 817 So. 2d 687, 692 (Ala. 2001), citing Western World Ins. Co. v. City of Tuscumbia, 612 So. 2d 1159 (Ala. 1992).

First, it is clear that the alleged covered losses fall within the coverage of the 2004 Policy, which contains a retroactive date of October 7, 1989. By its own terms of "What This Agreement Covers," covered losses include those "caused by a wrongful act committed on or after the retroactive date…." Thus, even though the annexation, license denial, and moratorium occurred before the effective date of the 2004 Policy, they came after the retroactive date and are covered, unless

excluded by an applicable exclusion.  It is here that St. Paul argues that the "known wrongful acts" exclusion comes into play; that is, because the Town knew of the annexation, license denial, and moratorium *before* the effective date of the 2004 Policy (even though they occurred during the coverage period of the 2003 Policy) and could reasonably foresee that those acts would result in a claim under the 2004 Policy, coverage is excluded.

      In this case, however, ambiguity arises from several Policy provisions, and ultimately that ambiguity must be construe against the insurer, St. Paul.  The "known wrongful acts" exclusion purports to exclude coverage for any wrongful act any insured ("protected person") knew about "before the beginning date of *this agreement*" and which could reasonably be foreseen as one resulting in "a claim being made or brought while *this agreement* is in effect."  (Italics added)  The phrase "this agreement" is ambiguous when read in the light of the retroactive date of October 7, 1989, and the provision that the Policy covers losses "caused by a wrongful act committed on or after the retroactive date…."  Given the reference to the retroactive date, does the phrase "this agreement" refer only to the specific 2004 renewal Policy, or does it refer to a seamless, integrated agreement composed of the original 2003 Policy subsequently renewed in identical form by the 2004 Policy?  A person of ordinary intelligence could read these policy provisions and understand them to mean that the "agreement" referred to in the exclusion is the

combined 2003 Policy and its identical renewal in 2004, not just the specific 2004 renewal.   Under such a reading, only those wrongful acts known about by a protected person *before the 2003 Policy* became effective would be excluded.[10] Wrongful acts occurring *during* the term of the 2003 Policy (and, thus becoming "known" during that term) would not be excluded because they did not pre-date "this agreement," where "this agreement" is understood to mean the seamless coverage provided by the 2003 Policy and its renewal year-to-year.

Although not involving exactly the same issue, the Eleventh Circuit case of Cast Steel Products, Inc. v. Admiral Ins. Co., 348 F.3d 1298 (11th Cir. 2003), is instructive.   Relying on Florida law (which is virtually indistinguishable from Alabama law on this point), the Eleventh Circuit concluded that a provision of a "claims-made" policy was ambiguous and should be construed in favor of the insured because it created the possibility that a claim accruing during the term of a policy, but being first presented during the subsequent renewal of the policy, would still not be covered.   The court said:

---

[10]   This reading is consistent with the fundamental purpose of the exclusion.   The "known wrongful acts" exclusion is designed to prevent someone who has engaged in wrongful acts from thereafter seeking to have those acts covered by a "claims-made" policy.   If the putative insured is aware of wrongful acts predating the insurance agreement, he should not be allowed to seek to protect himself against a claim being made on them by obtaining "claims-made" insurance. Under the facts of this case, the Town obtained its coverage in October 2003, before the alleged wrongful acts alleged in 2004, not afterward.

The district court's decision presents a somewhat alarming scenario. Faced with two consecutive insurance policies that created apparently seamless coverage over two policy periods, the court nevertheless found that a claim accruing within the two periods was somehow not covered by either policy. On the face of the [1999] and [2000] Policies, there appears to be no gap in coverage. Indeed, the 99 Policy was effective until 12:01 a.m. on January 6, 2000, and the 00 Policy was retroactively effective beginning on January 6, 2000 (presumably at 12:01 a.m.). At a glance, one would be hard pressed to imagine how a claim accruing in the middle of the two policy periods would not be covered by one of the policies.

Cast Steel Products, Inc. v. Admiral Ins. Co., 348 F.3d 1298, 1301-02 (11th Cir. 2003). The court found that the provision of the policy dealing with the "extended reporting period" was ambiguous in that it did not describe how claims made after the end of the term of the agreement are treated in renewal situations, in contrast to cancellation and non-renewal circumstances. Construing the language in favor of the insured, the court read the contract as providing a similar "extended reporting period" in cases of renewal of the insurance agreement, like that provided in non-renewal cases.

The same questions can be asked here. How can it be that losses caused by allegedly wrongful acts occurring during the effective term of the 2003 claims-made Policy, upon which an actual claim was made during the 2004 renewal of the

Policy, are not covered by either insurance contract?[11]  Plainly, the 2003 insurance Policy implicitly anticipated that coverage might be "renewed" year-to-year when it explained what happens to the "limited reporting period" upon a non-renewal. Such a renewal of insurance coverage is view by the ordinary man as being a seamless continuation of coverage provided in the original insurance agreement. The average insured does not view each yearly renewal contract as a separate agreement, but, rather, simply annual renewals of the same contract.  Construing this ambiguity against St. Paul, as Alabama law requires, the term "this agreement" in the "known wrongful acts" exclusion must be read as a seamless, continuous insurance agreement composed of the original and annual renewals of the agreement.   Where the insured merely renews his insurance and there is no cancellation or change of carrier, "[s]uch an event should not precipitate a trap wherein claims spanning the renewal are denied."   Cast Steel Products, Inc. v. Admiral Ins. Co., 348 F.3d 1298, 1303 (11th Cir. 2003), quoting Helberg v. Nat'l Union Fire Ins. Co., 102 Ohio App.3d 679, 657 N.E.2d 834 (1995).

---

[11]    The instant case is different from Cast Steel Products on this point.  In Cast Steel Products, the court of appeals resolved the ambiguity by reading into the contract an "extended reporting period" in renewal situations comparable to that provided upon cancellation or non-renewal.  In this case, reading a "limited reporting period" into the 2003 Policy when it was renewed, comparable to that provided upon non-renewal, still puts the December 16, 2004, written Notice of Claim filed by M&N three days outside such a "limited reporting period."  The 2003 Policy expired on October 14, 2004, so the 60-day "limited reporting period" would expire December 13, 2004.  Nevertheless, ambiguity still exists in the 2003 and 2004 Policies with respect to the meaning of the phrase "this agreement" in the "known wrongful acts" exclusion.

Under the undisputed facts here, the 2004 Policy simply followed the identical 2003 Policy.  A person of average intelligence would believe that his insurance coverage simply continued uninterrupted from one policy-year to the next, and he would not anticipate that he would not be covered for alleged wrongful acts occurring during the term of one policy simply because the "claim" for those acts is presented during the term of an identical renewal policy.  Thus, when referring to time periods "before" the effective date of "this agreement," the key date is the effective date of the original insurance contract, not the anniversary dates of subsequent renewals of the same coverage.  Because the alleged wrongful acts of the Town's annexation, denial of a business license, and institution of a moratorium on new license applications all occurred after the effective date of the original 2003 Policy, the court finds that the "known wrongful acts" exclusion does not apply because the alleged wrongful acts were not known to the Town or any protected persons *before* the effective date of the "this agreement," where "this agreement" is understood to be the seamless insurance contract created by the original 2003 Policy and its 2004 annual renewal.

### C.  "Non-Monetary Relief" Exclusion

The PEML portion of the policy contains an exclusion regarding various forms of non-monetary relief that might be sought against the insured, which reads as follows:

We won't cover:
- any cost, expense, or fee; or
- any amount required to comply with a court or administrative agency order, judgment, ruling or decree, or a federal, state, or local law;

that results from any action or demand, or any part of any claim, which seeks declaratory, injunctive, or other non-monetary relief.

Such costs, expenses, fees, or amounts include the following:
- The costs of physical alterations or other changes made to accommodate or afford accessibility to any disabled person.
- The cost of developing, implementing, or enforcing any company policy, procedure, or program.

*Declaratory, injunctive, or other non-monetary relief* includes:
- a judgment which declares the rights and duties of any person or organization; or
- any type of injunction, restraining order, or any other non-monetary relief.

(Doc. 35-25, p. 82).

St. Paul argues that it has no duty to defend or indemnify the Town of Gurley in regard to M&N's Counts III, IV, and V because those claims fall under the policy exclusion for "Declaratory, Injunctive, or Other Non-monetary Relief." Counts III, IV, and V state, as follows:

Count III – Declaratory Judgment: "A judgment from this Court invalidating the annexation and/or zoning of the property and other official actions of the Town would settle a present justiciable claim or controversy and declare the rights of the parties to this action."

47

Count IV – Declaratory Judgment Under Alabama Law:  "A judgment from this Court invalidating the annexation and/or zoning of the property and other official actions of defendants would settle a present justiciable claim or controversy and declare the rights of the parties to this action."

Count V – Injunction:  "An order enjoining the continued enforcement of the Town's punitive annexation and oppressive and invalid scheme of regulations and ordinances would adequately balance the harms currently occurring to M&N."

(Case No. 5:14-cv-00184-CLS, Doc. 1, pp. 9-13).    M&N, however, states that, although "M&N does seek equitable relief in its lawsuit, M&N's takings and arbitrary-and-capricious claims both seek compensatory damages, and of course, each of those claims supports an award of monetary compensatory damages." (Doc. 37, p. 17).  M&N argues that "[b]ecause the complaint contains multiple claims that seek compensatory damages, St. Paul owes coverage under the PEML policy."  (Id.)

The Town points out, in its motion for summary judgment, that Counts III-V, although styled as claims for declaratory and injunctive relief, seek interest, costs, attorney fees, and "all other further or different legal . . . relief."  (Doc. 32-1, p. 31).  The Town argues, therefore, that Counts III, IV, and V are "inextricably intertwined" with Counts I and II, which undisputedly seek monetary damages. Further, the Town claims that, because Counts III, IV, and V are so closely linked

with the other claims, St. Paul must defend them even if the claims, for purposes of indemnification, fall into the "non-monetary relief" exclusion, and that the language in the policy itself requires coverage at least for purposes of defense. To support this claim, Gurley cites to the PEML portion of the policy, which discusses St. Paul's duty to defend:

> **Right and duty to defend a claim.** We'll have the right and duty to defend any protected person against a claim for covered loss. We'll do so even if any of the allegations of such claims are groundless, false, or fraudulent. But we won't have a duty to perform any other act or services.
>
> . . .
>
> Our duty to defend to defend [sic] protected persons against claims for covered loss ends when we have used up the limits of coverage that apply with the payment of judgments or settlements.

(Doc. 32-1, p. 32). The Town contends that, because there has not yet been a judgment or settlement of the underlying suit, St. Paul's duty to defend has not ended under the policy. St. Paul correctly points out in its response to the Town's motion for summary judgment, however, that the right and duty to defend section of the Policy limits itself to defending protected persons against a claim for *covered* loss. (Doc. 41, p. 27). St. Paul argues that Counts III, IV, and V do not allege covered losses because they seek only non-monetary relief and, therefore,

are not subject to the duty to defend.  St. Paul also disputes the argument that it must defend Gurley on Counts III, IV, and V, because those claims are "inextricably intertwined" with Counts I and II.  Id. at 26.

St. Paul quotes State Farm Fire & Cas. Co. v. Middleton, stating that "if there is no ambiguity, insurance contracts must be enforced as written, and courts should not defeat express provisions in a policy, including exclusions from coverage, by making a new contract for the parties."  65 F. Supp. 2d 1240, 1244 (M.D. Ala. 1999), quoting Guaranty Nat'l Ins. Co. v. Beeline Stores, 945 F.Supp. 1510, 1513 (M.D. Ala. 1996).  It does not seem, however, that M&N and the Town are requesting that the court create a new policy; the argument is, at least for the purpose of defense, that "[a]s long as the complaint comprehends an injury which may be within the scope of the policy, the company must defend the insured until the insurer can confine the claim to a recovery that the policy does not cover."  St. Paul Fire and Marine Ins. Co. v. Town of Gurley, Ala., 2012 WL 3637690, *4 (N.D. Ala., August 22, 2012), quoting Nationwide Ins. v. Zavalis, 52 F.3d 689, 694 (7th Cir. 1995).  As a practical matter, the defense of the claim that the Town arbitrarily and capriciously denied M&N due process is grounded on the very same set of facts underlying the non-monetary counts of the underlying complaint.  It makes practical nonsense to talk about defending Count II without also defending Counts III, IV, and V; any defense to the former is necessarily at least a partial

defense to the latter.[12]  Therefore, although St. Paul may, indeed, have no duty to defend the Town against Counts III, IV, and V, the court has determined that St. Paul does have a duty to defend the Town against Count II and, therefore, against all of the claims until such time as Count II is no longer in the underlying case.

### III.    Duties of St. Paul

This court has previously discussed the duty of insurers to defend and indemnify insureds:

> Under Alabama law, an insurer's duties of defense and indemnity are related but distinct and thus require separate analysis.  Porterfield v. Audubon Indem. Co., 856 So. 2d 789, 792 (Ala. 2002) (citation omitted) ("Armstrong").  Specifically, an insurer's duty to defend is more extensive than its duty to indemnify.  U.S. Fid. & Guar. Co. v. Armstrong, 479 So. 2d 1164, 1168 (Ala. 1985) (citations omitted). The complaint allegations primarily govern the scope of the duty to defend.  Id. (citations omitted).  If these allegations reveal a claim within the policy coverage, then the insurer must defend, regardless of the ultimate liability of the insured.  Ladner & Co. v. S. Guar. Ins. Co., 347 So. 2d 100, 102 (Ala. 1977) (citation omitted).  But an insurer's duty to defend is not solely determined from the facts alleged in the complaint.  Id. at 103.  A court may look to the facts that can be proved by admissible evidence.  Pac. Indem Co. v. Run-A-Fort Co., 276 Ala. 311, 161 So. 2d 789, 795 (1964).  When a complaint alleges both acts covered under a policy and acts not covered, the insurer must at least defend the covered allegations.

---

[12]    The court recognizes, of course, that there might be additional defenses to the non-monetary counts beyond simply contesting the facts of the case.  For example, the counts seeking equitable relief might involve defenses of lack of clean hands or the adequacy of remedies in law.

Blackburn v. Fid. & Deposit Co. of Md., 667 So. 2d 661, 670 (Ala. 1995) (citation omitted).

Employers Mut. Cas. Co. v. Smith Const. & Dev., LLC, 949 F. Supp. 2d 1159, 1167-68 (N.D. Ala. 2013).

### A. Duty to Defend

"Whether an insurance company owes its insured a duty to provide a defense in proceedings instituted against the insured is determined primarily by the allegations contained in the complaint. Porterfield, 856 So.2d 789, 792 (Ala. 2002) (internal citations omitted). Because, as determined above, M&N has alleged in the underlying action claims that are subject to coverage under the policy, St. Paul has a duty to defend the Town of Gurley in the underlying action. Further, because, "[a]s long as the complaint comprehends an injury which may be within the scope of the policy, the company must defend the insured until the insurer can confine the claim to a recovery that the policy does not cover," St. Paul must defend Gurley against all claims in the action. St. Paul Fire and Marine Ins. Co. v. Town of Gurley, Ala., 2012 WL 3637690, *4 (N.D. Ala. August 22, 2012), quoting Nationwide Ins. v. Zavalis, 52 F.3d 689, 694 (7th Cir. 1995).

### B.  Duty to Indemnify

Because there has been no judgment or settlement in the underlying case, the issue of indemnification is not yet ripe and the court will not rule on the issue. Employers Mut. Cas. Co. v. Smith Const. & Development, LLC, 949 F.Supp. 2d 1159, 1176 (N.D. Ala. 2013); See, *e.g.*, Allstate Ins. Co. v. Employers Liab. Assurance Corp., 445 F.2d 1278, 1281 (5th Cir. 1971)[13] ("[N]o action for declaratory relief will lie to establish an insurer's liability . . . until a judgment has been rendered against the insured since, until such judgment comes into being, the liabilities are contingent and may never materialize."); Allstate Indem. Co. v. Lewis, 985 F. Supp. 1341, 1349 (M.D. Ala. 1997) ("The duty to indemnify is not ripe for adjudication until the insured is in fact held liable in the underlying suit") (citation omitted).

### RECOMMENDATION

For the reasons set forth herein, the undersigned RECOMMENDS the following:

---

[13] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981)(*en banc*), the Eleventh Circuit Court of Appeals adopted as precedent decision of the former Fifth Circuit rendered prior to October 1, 1981.

1.   The motion for summary judgment filed by St. Paul (doc. 33) be DENIED;

2.   The motion for summary judgment filed by the Town of Gurley (doc. 32) be GRANTED insofar as St. Paul is required to defend the Town in the underlying action and DENIED as unripe on the issue of indemnification; and

3.   The motion for summary judgment filed by M&N (doc. 36) be GRANTED insofar as St. Paul is required to defend the Town in the underlying action and DENIED as unripe on the issue of indemnification.

## NOTICE OF RIGHT TO OBJECT

Any party who objects to this Report and Recommendation must, within fourteen (14) days of the date on which it is entered, file specific written objections with the clerk of this court. **Any objections to the failure of the magistrate judge to address any contention raised in the petition also must be included.** Failure to do so will bar any later challenge or review of the factual findings, except for plain error.  See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S. Ct. 899, 88 L. Ed. 2d 933 (1986); Nettles v. Wainwright, 677 F.2d 404 (5th Cir. 1982)(*en banc*).  In order to challenge the findings of the magistrate judge, a party

must file with the clerk of the court written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection.  A copy of the objections must be served upon all other parties to the action.

Upon receipt of objections meeting the specificity requirement set out above, a United States District Judge shall make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendation made by the magistrate judge.  The district judge, however, need conduct a hearing only in his or her discretion or if required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The district judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.  Objections not meeting the specificity requirement set out above will not be considered by a district judge.

A party may not appeal a magistrate judge's recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final judgment entered by or at the direction of a district judge.

DONE this 10th day of July, 2015.

_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE